# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JEROME WILLIAMS,        )
                                      )
            Petitioner,      )
                                      )
v.                                      )       Case No. 4:18 CV 359 CDP
                                      )
JEFF NORMAN,           )
                                      )
            Respondent.    )

## MEMORANDUM AND ORDER

This case is before the Court on the petition of Jerome Williams for writ of

habeas corpus pursuant to 28 U.S.C. § 2254. A state jury convicted Williams of

first-degree murder and armed criminal action. Williams received a sentence of

life without the possibility of parole for murder and a consecutive sentence of life

imprisonment with the possibility of parole for armed criminal action. His

conviction and sentence were affirmed by the Missouri Court of Appeals. *State v.*

*Williams,* 422 S.W. 3d 456 (Mo. Ct. App. 2013) (Resp. Exh. E). The Missouri

Court of Appeals later affirmed the denial of his post-conviction motion filed

under Missouri Supreme Court Rule 29.15. *Williams v. State*, 510 S.W.3d 907

(Mo. Ct. App. 2017) (Resp. Exh. I).

In his petition for habeas corpus, Williams asserts sixteen grounds for relief.

Thirteen of his claims are procedurally barred. The Missouri Court of Appeals

addressed three of Williams's claims and denied them on the merits. Because the state appellate court's decision was not an unreasonable application of clearly established law and was not based on an unreasonable determination of the facts, I will deny Williams's petition for writ of habeas corpus.

## **Background**

The Missouri Court of Appeals described the factual and procedural background of this case on direct appeal as follows:

> On November 12, 2010, Damon Hollis (Victim) went to Defendant's [Williams's] home at 4933 Penrose in the City of St. Louis to play some dice games. Several other individuals came and went from Defendant's home during the dice games. James Greenlee, Daryl Greenlee, and Greg Murry were at Defendant's home sometime between midnight and 1:00 a.m. on November 13, 2010, and saw a man matching Victim's description shooting dice there. When the Greenlees and Murry left, Victim and Defendant were still at Defendant's home. Brent Alexander, Derrick Altemus, Sean Sanders, Markus Rockett, and Michael Walker were all at Defendant's home at one time or another in the early hours of November 13, 2010. Rockett and Walker arrived after 1:30 p.m. and stayed only 10 or 15 minutes. Alexander and Altemus left after 4:00 a.m. The only individuals remaining at Defendant's home were Defendant and Victim.
>
> Around 4:00 a.m., Clover Stubblefield (Stubblefield), who was Victim's girlfriend, awoke to discover she had received a cell phone voicemail message from Victim. Stubblefield knew that Victim had gone out to play craps, but Victim had not yet returned to the home he shared with Stubblefield. Stubblefield did not know whether Victim had gone to Defendant's home to play craps or to a different address to play craps. Stubblefield had gone with Victim to a craps game at Defendant's house on a previous occasion, so she knew it would be "an all night thing." At the previous craps game, Stubblefield had observed that individual's tempers might flare and they would argue and "talk trash," but the game would continue. After listening to the voicemail message from Victim, Stubblefield called him back. Victim answered and told Stubblefield that he

had won some money.  Stubblefield heard loud background noise, including people telling Victim, "Shoot, shoot, shoot."  Stubblefield then heard a voice say, "Shut the f*** up.  I'm going to make your ass get buck naked."  The phone call ended abruptly.  Stubblefield went back to sleep.

Sometime after 6:00 a.m., Stubblefield woke up and looked out the window to see if Victim's car was parked in the alley, which would indicate Victim was home.  Stubblefield did not see Victim's car, so she looked at her phone and noticed another voicemail message from Victim.  When Stubblefield listened to the voicemail message, she did not hear Victim's voice but heard a voice she thought was Defendant's.  Some of the message was muffled, but Stubblefield heard the following:

It's a dead mother f*****.  Just relax baby

(inaudible).

I want you to wash all this money off, you hear me?  All of it.

(inaudible).

don't worry about it.

(inaudible) Pap? (inaudible)

Shut the f*** up and do what I ask you to do n*****

These bitch ass n***** don't live for f****** with this (inaudible) Make sure he's dead mother f*****

(inaudible)

It's your turn bitch ass n*****

Put them keys in the side (inaudible) move they car.

(inaudible) the keys right here, make sure you put them in the (inaudible).

(inaudible) its your turn (inaudible).

You better not move, if you (inaudible) another breath I'm gonna kill you again.

(inaudible)

C'mon (inaudible) baby

(inaudible)

You gonna f*** with (inaudible) nephew?

(inaudible) then I f*** bitch ass.

Where the rest of the money at?

(inaudible)

(inaudible) gimmee them keys (inaudible)

At approximately 8:20 a.m., police were called to the scene of a car fire near 1410 Newhouse in the City of St. Louis. The burned car was Victim's, and Victim's body was in the back seat. Victim was already dead when his body was burned; he had sustained gunshot wounds to his head and chest. Police found blood stains on the car's license plate, hub caps, and backseat. The blood was later determined to be Victim's blood.

After Victim's body was found, police met with Stubblefield. Stubblefield provided police with the voicemail message she had received around 6:00 a.m. and told police the voice was Defendant's. Stubblefield also directed police to Defendant's home. When police arrived there to investigate, they found blood on the grass in the yard and blood spots on the stairs, handrail, and backdoor. After securing a warrant to search Defendant's home, police found what appeared to be blood in the kitchen. Although an attempt had been made by someone to clean the blood from the linoleum floor in the kitchen, police discovered blood underneath the linoleum. The blood was later determined to be Victim's blood. Police also found two bullet casings, two bullets, and a bullet hole in the floor.

Police later interviewed Defendant, who stated that he had been at his girlfriend's (Girlfriend) house at the time of the murder. Based on that information, police obtained search warrants for Defendant's and Girlfriend's cell phone records from telephone companies. Police reasoned that the records could be used to pinpoint the location of Defendant at the time of the murder through the use of location-based data based on "pings" between Defendant's and Girlfriend's cell phones and cellular telephone towers. Once the warrants were issued and police obtained the records, an employee of the police department, Emily Blackburn (Blackburn), then plotted the "pings" using longitude and latitude in relation to cellular telephone towers, the location of the murder, and the location where Victim's body was found.

Prior to trial, Defendant filed his motion in *limine* to preclude the admission of cellular telephone tower "ping" evidence or, in the alternative, for a <u>Frye</u> hearing to determine the admissibility of scientific testimony and evidence. During a pre-trial hearing on the motion in *limine*, Defendant argued that to allow such "ping" evidence was irrelevant and would mislead the jury becase "a ping off of one tower is not an accurate way to track a cell phone" in that cell phones were not intended to be used for tracking individuals and cell towers were not designed to track cell phones or to show the location of a specific cell phone. Defendant argued his research had shown that at "any one time when a cell phone is looking to either make a call or receive a call or even as a person is just traveling and the phone is in their pocket . . . [the] phone is looking for a tower to connect to." Defendant argued that proximity was not the only factor in determining whether a cell phone "pings" off a particular cellular telephone tower. Defendant argued that multiple factors could affect a cell phone's connection to a particular tower, including the make and model of the phone; the wattage and bandwidth of the phone; whether the call originated inside or outside of a building; whether the call took place in an urban or rural environment; the topography of the area in which the tower was located; the number, location, and height of the antennae on a particular tower; the direction and angle for which the antennae on a particular tower are set to receive phone calls; the tower's height above sea level; the channel assignments to the tower; the number of cell phone providers utilizing a particular tower; the number of cell phone providers within a call region; and weather conditions. Defendant argued there was no proof that a phone call would "ping" off the closest cellular telephone tower because a cell phone seeks the tower with the strongest signal, not necessarily the closest tower. Defendant argued that, given the

unsound science of locating an individual through cell phone data, the State's "ping" evidence should be excluded at trial for the purposes of showing Defendant's specific location in relation to a cellular telephone tower, or in the alternative, the State should be required in a <u>Frye</u> hearing to qualify as an expert any witness who would testify to the technology and relationship of cell phones and cellular telephone towers in determining when a "ping" from a cell phone goes to a particular tower versus another tower in the same coverage area.

The prosecutor counter argued that Defendant's motion in *limine* should be denied and that a <u>Frye</u> hearing to determine whether Blackburn was qualified as an expert was unnecessary. The prosecutor acknowledged that the map plotted by Blackburn would not be able to show that Defendant "was standing 25 feet away from [Victim's] body" at the time of the murder or at the time Victim's body was burned; however, the jury would be able to use the map to "extrapolate that at [a particular time Defendant's] phone pinged – in a five-minute period pinged less than a block from a body." The prosecutor argued that the map of "pings" showed a pattern and a radius and that Defendant "must have been within the radius" where the murder occurred and where Victim's body was found. The prosecutor noted that Girlfriend's cell phone records showed her "pings" were roughly the same and somewhat overlapped Defendant's, showing a similar pattern of movement as Defendant. The prosecutor further argued that Blackburn could testify either as a layperson or be qualified to testify as an expert regarding how the cellular telephone towers operated. The prosecutor acknowledged that the State's case was based on circumstantial evidence but argued that the map and Blackburn's testimony would be only "one small . . . part of the case."

The trial court thereafter overruled and denied Defendant's motion in *limine* and request for a <u>Frye</u> hearing. The trial court specifically stated that it would allow the State to call Blackburn as a witness during its case in chief. At trial, the State called Blackburn as a witness. When the prosecutor began to question Blackburn about the map on which she had plotted Defendant's and Girlfriend's cell phone "pings," Defendant objected to the line of questioning based on his motion in *limine*. The trial court overruled the objection. Blackburn subsequently testified that a "ping" is the connection a cell phone makes with a cellular telephone tower when a cell phone call is made. Blackburn testified that she did not know all of the factors involved in determining whether a particular tower would relay a cell phone call but

"a lot of it has to do with proximity, the [number] of people making calls at the time, topography of the land . . . capacity of the server, how many towers are in the area." Blackburn testified that a "ping here or there can be data anomalies or depending on if you're a budget carrier . . . how good the cell service is."

The State introduced Exhibit 156 and 157, which were the maps plotting the "pings" from Defendant's and Girlfriend's cell phones on the day of Victim's murder between 12:19 a.m. and 11:01 a.m. Defendant objected to the admission of the maps, but the trial court overruled the objections. Blackburn testified that she had made the maps by designating Defendant's home address as the scene of Victim's murder, by designating the address of the car fire as the location where Victim's burned body was found, and by designating the address of Girlfriend's home. Blackburn further testified that she then used historical cell site data and the record of calls from Defendant's and Girlfriend's cell phones to plot the "pings" on the maps. Blackburn testified that 30 calls originating from Defendant's cell phone occurred between 2:06 a.m. and 7:35 a.m. Blackburn testified that she was "not a big cell phone user" and, in her experience, there was no "scientific guarantee" that a cell phone call would "ping" off of the cellular telephone tower closest to the phone; however, proximity was a "big factor." Blackburn acknowledged that several factors could affect a tower's ability to receive signals from cell phones, including whether repairs or maintenance was being performed on the tower; the wattage and technology of a specific cell phone; and the topography between the cell phone and the tower. Nevertheless, Blackburn testified that the maps established a pattern of movement of Defendant's and Girlfriend's cell phones, which allowed a person to draw a reasonable inference that the proximate location of Defendant and Girlfriend in the morning hours on the day of Victim's murder was in the area of the murder scene and the location where Victim's burned body was found.

After the close of all the evidence, the jury found Defendant guilty as charged. Defendant subsequently filed his motion for acquittal or, in the alternative, for a new trial. Defendant's motion alleged, in part, that the trial court erred in overruling Defendant's motion in *limine* to preclude the admission of cellular tower "ping" evidence or, in the alternative, for not ordering a Frye hearing to determine whether an expert was required to testify as to the veracity of such "ping" evidence to establish the location of

Defendant's cell phone.  The trial court overruled Defendant's motion for new trial and imposed sentence.  This appeal followed.

(Resp. Exh. E at 2-15).

## Discussion

In his petition for writ of habeas corpus, Williams raises sixteen grounds for

relief:

(1) The trial court erred in admitting maps and testimony regarding cell phone "pings" without determining whether the evidence was admissible expert testimony under the test announced in *Frye v. United States*, 293 F. 1014 (D.C. Cir. 1923);

(2) Trial counsel was ineffective in failing to call Lisa Stegall as an alibi witness;

(3) Trial counsel was ineffective for failing to object during the prosecutor's closing argument when the prosecutor argued that two witnesses identified petitioner's voice on Stubblefield's voicemail message;

(4) Appellate counsel was ineffective for failing to raise a claim on direct appeal that the trial court erred when it allowed the jury to use a transcript of Stubblefield's voicemail message while they listened to the audio recording;

(5) Trial counsel was ineffective for failing to properly file a pre-trial motion for discovery;

(6) Trial counsel was ineffective for failing to properly investigate the charges against petitioner;

(7) Trial counsel was ineffective for "failing to object to and accepting copies of exhibits from the prosecution during trial;"

(8) Trial counsel was ineffective for failing to present expert testimony about cell phone "pings" to rebut testimony presented by the prosecution;

(9) Trial counsel was ineffective for failing to investigate and prepare for trial;

(10) Trial counsel was ineffective for failing to call any witnesses on petitioner's behalf;

(11) Trial counsel was ineffective for failing to move the court for expert testimony to rebut the prosecution's exhibits;

(12) The trial court erred in rejecting defense counsel's request for a *Frye* hearing on the cell phone evidence;

(13) The trial court erred in instructing the jury about the transcript of Stubblefield's voicemail message;

(14) Appellate counsel was ineffective for "failing to raise a properly preserved objection relative to the aforementioned claim of trial court error;"

(15) Post-conviction review counsel was ineffective for failing to attach petitioner's original post-conviction claims to counsel's amended post-conviction motion; and

(16) Post-conviction counsel was ineffective for failing to raise a claim challenging the trial court's decision to allow the jury to use the transcript of Stubblefield's voicemail message while the jury listened to the audio recording.

## I. Claims Adjudicated on the Merits

Grounds 1-3 were properly raised in the state courts and denied on the merits by the Missouri Court of Appeals. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner is entitled to habeas relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

Under subsection (1), a state court's decision is "contrary to" clearly established Federal law when it "applies a rule that contradicts the governing law" from Supreme Court cases, or when it considers "a set of facts that are materially indistinguishable from" a Supreme Court decision yet reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000). A state court's decision involves an "unreasonable application of" clearly established Federal law when it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. It is not enough for the federal habeas court to conclude that the state court's decision is merely incorrect; rather, the state court must have applied the law *unreasonably*. *Id.* at 411. *See also Schafer v. Bowersox*, 329 F.3d 637, 646-47 (8th Cir. 2003) (explaining the "contrary to" and "unreasonable application of" standards).

Under subsection (2), a "state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in state court proceedings' only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (quoting 28 U.S.C. § 2254(d)(2)). The petitioner has the

burden of making this showing by "clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1).

Ground One: Admission of Cell Phone Evidence

In Ground 1 of his habeas petition, petitioner argues that the trial court erred

in admitting maps and testimony based on petitioner's cell phone records from the

night of the murder. Petitioner contends that the trial court should have first held

an evidentiary hearing to determine whether the testimony was admissible expert

testimony under the test announced in *Frye v. United States*, 293 F. 1014 (D.C.

Cir. 1923). The Missouri Court of Appeals considered and rejected this claim on

direct appeal as follows:

> In his sole point on appeal, Defendant claims the trial court abused its
> discretion by admitting maps and testimony regarding cell phone records
> involving cellular tower "pings" associated with Defendant's and
> Girlfriend's cell phone numbers. Defendant argues that the trial court
> should have first determined the admissibility of the evidence in a <u>Frye</u>
> hearing. Defendant also argues that the evidence was improperly used by
> the State to "locate" Defendant and Girlfriend near the crime scene and the
> scene where the Victim's body was found because the ability of cellular
> tower signals to locate a cell phone (1) is a subject for an expert witness and
> (2) the State did not qualify Blackburn as an expert on the functioning of
> cellular towers or locating cell phones. Defendant further argues that the
> State improperly argued to the jurors that they could rely on the cell phone
> records, maps, and Blackburn's testimony to find that Defendant was at the
> scene of the murder then moved to the scene where Victim's body was
> burned.
>
> This court reviews the trial court's determinations regarding the
> admissibility of evidence for abuse of discretion. <u>State v. Hadley</u>, 357
> S.W.3d 267, 269 (Mo. App. E.D. 2012); <u>State v. Blakey</u>, 203 S.W.3d 806,
> 811 (Mo. App. S.D. 2006). "This standard of review compels the reversal of

a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion." State v. Daniels, 179 S.W.3d 273, 281 (Mo. App. W.D. 2005). "A trial court abuses its discretion where its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Blakey, 203 S.W.3d at 811.

"We review the trial court's admission or exclusion of evidence for prejudice and not mere error, and [we] will affirm the court's ruling unless it was so prejudicial that it deprived the defendant of a fair trial." Hadley, 357 S.W.3d at 269-70. "When the prejudice resulting from the improper admission of evidence is only evidence-specific and the evidence of guilt is otherwise overwhelming, reversal is not required." State v. Patton, 2013 WL 5530599 (Mo. App. E.D.) *5, quoting State v. Barriner, 34 S.W.3d 139, 150 (Mo. banc 2000). "In contrast, when the prejudice resulting from the improper admission of evidence is outcome-determinative, reversal is required." Patton, 2013 WL 5530599 at *5, quoting Barriner, 34 S.W.3d at 150. "Outcome-determinative prejudice occurs 'when the erroneously admitted evidence so influenced the jury that, when considered and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion.'" Patton, 2013 WL 5530599 at *5, quoting Barriner, 34 S.W.3d at 150. In Missouri, it is well settled that "expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence." Patton, 2013 WL 5530599 at *4, quoting State v. Harris, 305 S.W.3d 482, 490 (Mo. App. E.D. 2010). Expert testimony is proper if the subject is one with which lay jurors are not likely to be conversant. Patton, 2013 WL 5530599 at *4. However, if the subject is one of everyday experience, then expert opinion testimony is properly rejected. Id. In criminal cases, Missouri courts follow the test articulated in Frye v. United States, 293 F. 1013 (D.C.Cir. 1923): to admit testimony of an expert witness or the results of scientific procedures in a criminal case, the testimony must be based on scientific principles that are generally accepted in the relevant scientific community. Daniels, 179 S.W.3d at 280. Whether a procedure has gained acceptance in the relevant field and is admissible scientific evidence is established in a Frye hearing outside the presence of a jury. Id.

"[C]ellular phones are a subject of everyday experience, and . . . little technical knowledge is required to understand that a phone will connect to the cell site with the strongest signal." Patton, 2013 WL 5530599 at *4. On the other hand, knowledge regarding the location of a cell phone relative to the tower to which it connects is outside the realm of common knowledge and experience of a cell phone user. Patton, 2013 WL 5530599 at *3, citing State v. Manzella, 128 S.W.3d 602, 609 (Mo. App. E.D. 2004). When determining the location a cellular phone call originated in relation to a cell site or tower, it is misleadingly simple to state that the strongest signal generally comes from the closest site or tower because a "cell phone may be in range of several sites simultaneously, and a multitude of factors influence which site among them will have the strongest signal." Patton, 2013 WL 5530599 at *4. Consequently, to present evidence of the location of a cell phone relative to the cell site or tower to which it connects without the aid of specialized experience or knowledge in the field of cellular communications "comes too close to mere speculation." Id.

The situation in this case is similar to the situation recently reviewed by this Court in Patton. There, we held that the trial court did not abuse its discretion by declining to require a Frye hearing before admitting historical cell site date plotted on a map because reading the coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique. Patton, 2013 WL 5530599 at *1, *2. However, we also held that the trial court erred in failing to require an expert witness to testify as to the location of the defendant's cell phone in relation to the cellular telephone towers to which it connected because such testimony constituted analysis that is "properly the province of an expert" in the field of cellular communications. Patton, 2013 WL 5530599 at *1, *3-*4. Nevertheless, we further held that the failure to require an expert to so testify did not require reversal because evidence of the location of the defendant's cell phone in relation to the cellular telephone towers to which it connected and placing the defendant near the murder scene at the time of the crimes was not outcome-determinative given that other evidence of the defendant's guilt was overwhelming. Id. at *1, *5.

We find Patton instructive in this case. Here, like in Patton, the State introduced a map plotting the locations of the cellular towers "pinged" by Defendant's cell phone in order to place Defendant near the murder scene and near where Victim's burned body was found around the times of the murder and when the body was burned. This evidence derived from reading

the coordinates of cell sites from phone records and plotting them on a map was not a scientific procedure or technique. Patton, 2013 WL 5530599 at *1, *2. However, the State also introduced Blackburn's testimony to imply that Defendant's cell phone must have been connected to a particular cellular tower near the murder scene and the location where Victim's burned body because Defendant was in fact at the murder scene and the location where the body was burned when his cell phone "pinged" a particular tower. This testimony amounted to analysis of the many variables that influence cellular tower signal strength, and "[s]uch analysis amounts to opinion testimony that is properly the province of an expert." Patton, 2013 WL 5530599 *4. Blackburn was not an expert in the field of cellular communications, and no Frye hearing was conducted to determine whether the State could qualify Blackburn as an expert.

However, like we found in Patton, here we find no need to reverse due to the admission of Blackburn's testimony because, when considered with and balanced against all of the evidence properly admitted, there is no reasonable probability that the jury would have reached a different conclusion. See Patton, 2013 WL 5530599 *5. In Patton, we did not reverse the defendant's convictions on the basis of the improperly-admitted testimony regarding cell phone location because, in addition to other evidence, two eye witnesses placed the defendant at the scene of the crime and identified the defendant as the shooter. Id. at *5. Similarly, in this case, several witnesses testified that they saw Victim at the craps games in Defendant's home and that, when all of the other guests had departed around 4:00 a.m., only Victim and Defendant remained in Defendant's home. Stubblefield testified that she received a voicemail message from Victim at 6:00 a.m., but the voice of the individual speaking on the message was Defendant's voice. A recording of the voicemail message was played for the jury, and the message indicated that the person speaking had just killed Victim or was in the act of killing Victim. Furthermore, Victim's blood was found outside and inside Defendant's home and on Victim's car. In addition, police found two bullet casings, two bullets, and a bullet hole in the floor of Defendant's kitchen. As a result, we find Blackburn's testimony was not outcome-determinative since there is no reasonable probability that a jury would have reached a different conclusion given the substantial evidence presented against Defendant. Consequently, as we found in Patton, reversal of Defendant's convictions is not required. Point denied.

(Resp. Exh. E at 17-25).

"It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  This Court will reverse a state court evidentiary ruling "only if the petitioner shows that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995) (internal quotation marks and citation omitted).  To meet his burden of proof, petitioner must show that, absent the alleged impropriety, the verdict probably would have been different.  *Id.*

The Missouri Court of Appeals concluded that, even if Blackburn's testimony should not have been admitted, the error was not outcome-determinative and did not require reversal.  The appellate court found no reasonable probability that the verdict would have been different even if Blackburn's testimony had been excluded given the amount of evidence of petitioner's guilt presented at trial, which included eyewitness testimony placing the victim at petitioner's house, the incriminating voicemail message, the victim's blood (found outside and inside petitioner's house and car), bullet casings, bullets, and a bullet hole in petitioner's kitchen.

In denying petitioner's claim of evidentiary error on appeal, the Missouri Court of Appeals correctly identified the governing legal standards, and its determination that the admission of the testimony, even if erroneous, was not

outcome-determinative is entitled to deference. *See* 28 U.S.C. § 2254(d)(1). As the appellate court's determination also did not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, *see* 28 U.S.C. § 2254(d)(2), the decision is entitled to deference. Accordingly, Ground 1 of petitioner's habeas petition is denied.

Grounds Two and Three: Ineffective Assistance of Trial Counsel

In Grounds 2 and 3, petitioner alleges he received ineffective assistance of trial counsel in violation of the Sixth Amendment. Petitioner raised these claims in his motion for post-conviction relief and on appeal of its denial, and the Missouri Court of Appeals denied them on the merits. (Resp. Exh. I).

The Missouri Court of Appeals applied the following standard to petitioner's ineffective assistance of counsel claims on appeal:

> To prove ineffective assistance of counsel, a Movant must demonstrate that counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and counsel's deficient performance prejudiced him. Worthington v. State, 166 S.W.3d 566, 573 (Mo. banc 2005) (citing Strickland v. Washington, 466 U.S. 668, 687-88 (1984)). To satisfy the first prong of this test, a movant must "overcome a strong presumption that counsel provided competent representation by showing 'that counsel's representation fell below an objective standard of reasonableness." Id. (quoting Deck v. State, 68 S.W.3d 418, 425 (Mo. banc 2002)). To satisfy the second prong of this test, a movant must show that, had counsel not erred, there is a reasonable probability that the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. This Court does not need to address both components of the inquiry if the Movant makes an insufficient showing on one. Strickland, 466 U.S. at 697; Sidebottom v. State, 781 S.W.2d 791, 796 (Mo. banc 1989).

(Resp. Exh. I at 2-3).  In Ground 2, petitioner alleges that his trial counsel was

ineffective for failing to call Lisa Stegall as an alibi witness.  The Missouri Court

of Appeals rejected this claim on appeal as follows:

> For his first point, Movant asserts that his trial counsel was ineffective for
> failing to call Lisa Stegall as an alibi witness.  Stegall would have testified
> that Movant was with her on the night of the murder.
>
> To establish ineffectiveness of trial counsel for failing to call a witness, a
> movant must show that the witness could have been located by reasonable
> investigation, the witness would testify if called, and the testimony would
> provide a viable defense.[] Evans v. State, 239 S.W.3d 191, 194 (Mo. App.
> S.D. 2007).  Movant must show that, had the witness testified, the outcome
> may have been different, and trial counsel's failure to call the witness was
> something other than trial strategy.  Id.  The selection of witnesses is a
> matter of trial strategy, and counsel has wide latitude in matters regarding
> trial strategy.  Id.  It is virtually impossible to challenge a decision not to call
> a witness to testify as a matter of trial strategy.  Id.
>
> Here, Movant's counsel testified that he chose not to call Ms. Stegall
> because multiple phone calls between Movant and Stegall throughout the
> night of the murder "would present an issue in her testimony as presenting
> her as an alibi witness, and it was [counsel's] belief that it would present a
> stronger defense for Mr. Williams to not present that alibi as opposed to
> presenting it and being proven or shown to have flaws to the jury."
>
> In other words, counsel determined that Ms. Stegall's risk of impeachment
> outweighed the defensive value of her testimony.  The motion court found
> counsel's strategy reasonable.  Notably, the court found Stegall "not a
> credible witness at the evidentiary hearing," further referring to "evidence
> presented at the trial which strongly suggested Ms. Stegall was present with
> movant at the scene of the crime and not at her home."  The court reasoned
> that "counsel's decision not to call a witness is virtually unchallengeable
> particularly where the possibility exists that an alibi has been fabricated or
> that the witness will present perjured testimony."  State v. Hamilton, 791
> S.W.2d 789, 798 (Mo. App. 1990).  This court defers to the motion court's
> credibility determinations.  Rios v. State. 368 S.W.3d 301, 317 (Mo. App.

W.D. 2012).  On this record, counsel's decision not to call Ms. Stegall as a witness was well within the bounds of reasonable trial strategy and possibly prescribed by the rules of professional conduct.  Point I is denied.

(Resp. Exh. I at 2-3).  In Ground 3, petitioner alleges that trial counsel was ineffective for failing to object to the prosecutor's closing argument that two witnesses, James Greenlee and Derrick Altemus, had identified petitioner's voice in a phone message.  The Missouri Court of Appeals rejected this claim on appeal as follows:

> The trial record reflects that the witnesses, both Movant's friends, conceded that the voice "sounded like" Movant.  The prosecutor subsequently argued that the witnesses "told us it's his voice."  Counsel didn't object but reminded the jury in his rebuttal arguments that the witnesses "told you it could be but could not be, they can't be sure."
>
> "Ineffective assistance of counsel is rarely found in cases where trial counsel has failed to object."  Cornelius v. State, 351 S.W.3d 36, 44 (Mo. App. W.D. 2011).  The movant must prove that a failure to object was prejudicial and not strategic.  Id.  If counsel's failure to object is based on reasonable trial strategy, then the movant cannot demonstrate that counsel was ineffective. Id.  The failure to object to closing argument constitutes ineffective assistance only when the comment was of such a character that it resulted in a substantial deprivation of the defendant's right to a fair trial.  Id. Additionally, counsel is not ineffective for failing to make a meritless objection.  Zink v. State, 278 S.W.3d 170, 188 (Mo. 2009).
>
> Here, Movant's counsel explained that he didn't object because he "thought at the time that an objection was not necessarily necessary as I could address the facts to the jury in my portion."  Counsel opted to "allow certain leeway" to the State and then rebut the argument in his own turn.  "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance."  Worthington v. State, 166 S.W.3d 566, 573 (Mo. 2005).

While counsel's testimony alone is sufficient to establish trial strategy and defeat a claim of ineffectiveness, the motion court denied Movant's claim on another basis, namely that counsel's objection would not have been meritorious because the prosecutor's statement was supported by the evidence presented at trial. Specifically, the court noted that both witnesses testified that the voice on the phone message sounded like Movant, and the State is entitled to argue reasonable inferences from the evidence. State v. Edwards, 116 S.W.3d 511, 537 (Mo. 2003). The motion court's reasoning is sound, and we find no basis for reversal on this record. Any objection would have been within the trial court's discretion to overrule, and moreover counsel articulated a reasonable trial strategy for his silence. Point denied.

(Resp. Exh. I at 4-6).

Petitioner's ineffective assistance of trial counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* established a two-prong test to determine when counsel's ineffective performance violates the Sixth Amendment. On the first prong, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The second prong requires the defendant to "show that the deficient performance prejudiced the defense." *Id.* To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In applying *Strickland's* two prongs, the Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly

deferential," *id.* at 689, and that reviewing courts should indulge a strong presumption that counsel's actions fell within the "wide range of professionally competent assistance." *Id.* at 690. "Taken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011)). This means that petitioner must do more than "show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . ." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, he must show that the [Missouri Court of Appeals] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* at 699. Counsel cannot be ineffective for failing to make or win a meritless argument. *See Rodriquez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994).

In denying petitioner's ineffective assistance of trial counsel claims on appeal, the Missouri Court of Appeals correctly identified the governing legal standards, and its determination that counsel's decision not to call Stegall as an alibi witness was reasonable trial strategy given the high risk of impeachment and potentially perjured testimony was not an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). The same is true of the appellate court's determination that counsel's decision not to object during closing argument was reasonable trial strategy and not ineffective as a matter of law. *See Dyer v. United*

*States*, 23 F.3d 1424, 1426 (8th Cir. 1994) (counsel cannot be ineffective for failing to raise a meritless argument).  As the appellate court's determination also did not involve an unreasonable determination of the facts in light of the evidence presented in the  state court proceedings, *see* 28 U.S.C. § 2254(d)(2), the decision is entitled to deference.  To the extent petitioner argues that the appellate court should have decided the factual and legal issues differently, his arguments are insufficient to meet the difficult standard of showing the state court ruling "rested on an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013) (internal quotation marks and citation omitted).  Grounds 2 and 3 of petitioner's habeas petition are denied.

## II. Procedurally Defaulted Claims

State prisoners must fairly present all claims to the state courts.  When a prisoner has gone through all stages of direct appeal and post-conviction proceedings without presenting a claim to the state courts, that claim is procedurally defaulted.  *Sweet v. Delo*, 125 F.3d 1144, 1149 (8th Cir. 1997).  This means that a federal habeas court cannot hear the claim unless the prisoner demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claim[] will result in a

fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### Grounds Five Through Thirteen Are Procedurally Defaulted

Here, respondent argues that petitioner procedurally defaulted Grounds 5-16 by failing to present them to the Missouri courts. If true, this Court may not consider either claim unless petitioner can meet one of the two exceptions to procedural default. To qualify for the first exception, petitioner must show cause and prejudice. To demonstrate cause, he must show that "some objective factor external to the defense" impeded his efforts to present the claim to the state courts. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish prejudice, petitioner must demonstrate that the identified errors "worked to his actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The second exception requires petitioner to show that failure to consider the defaulted claims will result in a fundamental miscarriage of justice. To meet this standard, he must present new evidence that "affirmatively demonstrates that he is innocent of the crime for which he was convicted." *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006).

Petitioner complains that appellate and post-conviction counsel refused to properly raise some or all of the defaulted claims made his habeas petition despite his request that they do so. To the extent that this allegation is construed as an

attempt to allege cause and prejudice to overcome the procedural default of any of the defaulted claims, including Grounds 5-13, it fails. While ineffective assistance of appellate or post-conviction counsel can constitute cause to review a procedurally defaulted claim in certain circumstances, *see Martinez v. Ryan*, 132 S. Ct. 1309 (2012), petitioner has failed to meet his burden of demonstrating that the Court should review his defaulted claims based on the rote allegation that counsel failed to raise all requested claims. As petitioner does not argue that failure to consider these claims will result in a fundamental miscarriage of justice, he has failed to overcome the procedural default of these claims. Accordingly, Grounds 5-13 are denied.

Grounds Five Through Thirteen Are Also Meritless

Even if these claims were not defaulted, they are all meritless and would have been denied had they been properly raised. The majority of petitioner's defaulted claims are ineffective assistance of trial counsel claims governed by *Strickland* standard discussed above.

In Ground 5, petitioner complains that his attorney was ineffective for failing to file a pre-trial motion for discovery. This claim is denied as counsel filed several pre-trial discovery motions. (Resp. Exh. B at 4-11). Moreover, petitioner fails to allege any information that would have been obtained by further discovery

or how that information would have altered the outcome of his trial, so he fails to establish ineffective assistance as a matter of law. Ground 5 is denied.

In Grounds 6 and 9, petitioner argues that his trial counsel was ineffective for failing to adequately investigate the charges against him and prepare for trial. Petitioner's claims fail as his rote, generalized allegations of error are insufficient to overcome the presumption of effectiveness or establish requisite prejudice. Grounds 6 and 9 are denied.

In Ground 7, petitioner claims that his attorney was ineffective for failing to object to exhibits introduced at trial. These claims fail as petitioner has failed to identify any exhibits improperly introduced (other than the cell phone evidence already discussed above) or how counsel's failure to object to these exhibits prejudiced him. Ground 7 is denied.

In Grounds 8 and 11, petitioner alleges that his trial counsel was ineffective for failing to present expert testimony about the cell phone "pings" to rebut the prosecution's evidence. Petitioner's claims fail as he does not allege that there was an expert witness who was available to testify and would have given testimony favorable to petitioner. Moreover, although trial counsel did not present expert testimony, he moved to exclude the prosecution's witness from testifying about the cell phone "pings," and he objected to the introduction of the evidence and thoroughly cross-examined the witness at trial. As explained above, on direct

appeal the Missouri Court of Appeals concluded that, even if the evidence was improperly admitted, its admission did not require reversal because of the strength of the evidence against petitioner, which included eyewitness testimony, the voicemail message, and extensive physical evidence tying petitioner to the victim's murder. Given the appellate court's conclusion that there was no reasonable probability that the result of the trial would have been different even without the cell phone evidence, petitioner fails to establish the requisite prejudice necessary to demonstrate that his attorney was ineffective for presenting expert testimony on the subject. Grounds 8 and 11 are denied.

In Ground 10, petitioner alleges that counsel was ineffective for failing to call witnesses on his behalf. This claim is rejected as petitioner fails to specifically identify any witnesses (other than Lisa Stegall) who was available to testify and would have provided testimony favorable to petitioner.[1] Petitioner has failed to establish either deficient performance or resulting prejudice based on his rote allegations of attorney error. Ground 10 is denied.

Ground 12 merely restates the arguments made in Ground 1, which was rejected by the Missouri Court of Appeals on the merits. For the same reasons that Ground 1 was rejected, Ground 12 is also denied.

---

[1] That claim of error was addressed above.

Finally, in Ground 13 petitioner argues that the trial court erred by allowing the jury to review a written transcript of Stubblefield's voice mail message while they listened to the audio recording. In addition to being procedurally defaulted, this claim fails as it alleges only an error of state evidentiary law. Whether the trial court properly followed Missouri's evidentiary law is "no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Moreover, under Missouri law it was within the discretion of the trial court to allow the jury to use the transcript. *See State v. Williams*, 948 S.W.2d 429, 432 (Mo. Ct. App. 1997). For these reasons, Ground 13 is denied.

Grounds Four and Fourteen: Ineffective Assistance of Appellate Counsel

In Grounds 4 and 14, petitioner alleges that he received ineffective assistance of appellate counsel because counsel failed to challenge on appeal the trial court's decision to allow the jury to use a transcript of the recorded voice mail message while listening to it at trial. The transcript was not admitted into evidence, and the jury was instructed to be guided by what they heard. Missouri law requires defendants to raise all claims for ineffective assistance of counsel in post-conviction proceedings under Rule 29.15. *Martin v. State*, 386 S.W.3d 179, 185 (Mo. Ct. App. 2012) ("Rule 29.15 provides the exclusive procedure by which a person convicted of a felony may seek relief for certain claims, including claims of ineffective assistance of trial and appellate counsel."). Because petitioner did

not include these claims in his appeal of the denial of his Rule 29.15 motion, he failed to present them to the Missouri courts in accordance with state law and they are procedurally defaulted. Accordingly, this Court may not consider them unless petitioner can establish cause and prejudice or that the failure to consider it will result in a fundamental miscarriage of justice. To the extent petitioner's habeas petition can be construed to argue that ineffective assistance of his post-conviction counsel constitutes cause to excuse the procedural default, this argument is rejected. *See Davila v. Davis*, 137 S. Ct. 2058, 2062-63 (2017) (ineffective assistance of post-conviction counsel cannot constitute cause to overcome the procedural default of a claim of ineffective assistance of appellate counsel).

Moreover, these claims, even if properly raised, would have been denied as meritless because it was within the trial court's sound discretion whether to permit the jury to view the transcripts. *See Williams*, 948 S.W.2d at 432. Counsel cannot be ineffective for failing to raise a meritless argument as a matter of law. As petitioner does not argue that failure to consider this claim will result in a fundamental miscarriage of justice, he has failed to overcome the procedural default of Grounds 4 and 14 and they are accordingly denied.

### III. Non-Cognizable Claims

<u>Grounds Fifteen and Sixteen: Ineffective Assistance of Post-Conviction Counsel</u>

In Grounds 15 and 16, petitioner argues that he was denied effective assistance of post-conviction counsel. These claims are denied as not cognizable in habeas review. *See* 28 U.S.C. § 2254(i) ("ineffectiveness or incompetence of counsel during Federal or State post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Price v. State*, 422 S.W.3d 292, 297 (Mo. banc 2014) ("The lack of any constitutional right to counsel in post-conviction proceedings [under Rule 29.15], however, precludes claims based on the diligence or competence of post-conviction counsel (appointed or retained), and such claims are 'categorically unreviewable.'") (quoting *Eastburn v. State*, 400 S.W.3d 770, 774 (Mo. banc 2013)).

Grounds 15 and 16 of petitioner's habeas petition are denied.

## Certificate of Appealability

When a petitioner is denied a writ of habeas corpus under 28 U.S.C. § 2254, the petitioner may not appeal unless granted a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). To be entitled to a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right. § 2253(c)(2); *see Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). A showing is substantial when the issues raised are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further

proceedings.  *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).  Because I find

none of these to be the case, I will deny a certificate of appealability on all claims.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Jerome Williams for writ

of habeas corpus pursuant to 28 U.S.C. § 2254 [1] is denied.

**IT IS FURTHER ORDERED** that the petitioner has not made a substantial

showing of a denial of a constitutional right and this Court will not grant a

certificate of appealability.

A separate judgment in accordance with the Memorandum and Order is

entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of February, 2019.